## No. 5632.

### Charles McGill v. The State.

1. JURY LAW—CHALLENGE—CASE STATED.—In the trial of a negro for the murder of a whte man, a proposed juror, when examined on his *voir dire,* said that he was prejudiced against negroes as a race, and he was challenged by the defense for cause. Answering further, the proposed juror explained that by the prejudice specified, he meant that he did not regard a negro to be as good as a white man, but that he could, as a juror, try a negro for killing a white man as impartially as he could a white man for killing a negro; whereupon the juror was held competent, and the defense excepted and challenged the juror peremptorily. The trial court then reconsidered its ruling, discharged the proposed juror, and did not count the challenge against the defendant, and the panel was completed without the defense having exhausted its peremptory challenges. *Held:* 1, That the juror was competent; and, 2, that the trial court in effect sustained the defendant's challenge for cause.

2. SAME—EVIDENCE.—See the statement of the case for the evidence of the State's witness Pate, *held* relevant and to have been properly admitted over objection that it was too remote.

3. PRACTICE—PRIVILEGE OF COUNSEL.—See the statement of the case for the substance of remarks used in argument by the counsel for the State *held* not to constitute a material abuse of the privilege of counsel, in view of the action of the court condemning it in the hearing of the jury.

4. EVIDENCE—VENUE is an issue in a criminal case which may be as effectually proved by circumstantial as by direct evidence. It is not essential that it shall be established beyond a reasonable doubt, but, if the evidence be reasonably sufficient to satisfy the jury that the offense was committed in the county of the prosecution, its finding to that effect will not be disturbed by this court.

5. SAME—MURDER—FACT CASE.—The courts of this State take judicial notice of the boundaries and limits of counties, and of their relation or contiguity to each other. See the opinion in extenso for proof *held* sufficient to support an allegation of venue; and the statement of the case for evidence *held* sufficient to support a capital conviction for murder.

APPEAL from the District Court of Milam. Tried below before the Hon. John N. Henderson.

The appellant was convicted in the first degree, and was awarded the death penalty, for the murder of W. T. Leonard,

in Milam county, Texas, on the eighteenth day of June (as charged in the indictment), 1887.

James Leonard was the first witness for the State. He testified that the deceased, who was his son, would have attained the fifteenth year of his age in August, 1887, and was about five feet high, and would weigh about ninety pounds at the time of his death. The witness lived in Brazos county, about three and a half miles southwest from the town of Bryan. He last saw the deceased, in life, at his said house on the evening of Monday, June 13, 1887, on which evening the deceased left home to go to the house of his uncle in Rockdale, Milam county. The deceased was wearing a straw hat when he left, but not the straw hat which is here exhibited as the hat found near the body. He wore off a suit of woolen clothes, the coat, vest and trousers being alike. Witness had never seen the vest and trousers since the deceased left home; but on his arrival at Cameron to attend this trial, he was shown and identified the deceased's coat, in the office of the sheriff. The deceased took off a muzzle loading double barreled shot gun with him, which gun the witness found in Hearne, in the office of Mr. Riley. The deceased, whose name was W. T. Leonard, was called and known as Willie Leonard.

Cross examined, the witness stated that the woolen suit of clothes worn by the deceased when he left home was dark in color, with brown stripes. The witness bought that suit, ready made, from Mr. Koppe, a gentleman's furnishing merchant of Bryan. Koppe had other suits of the same color, style and material in his stock. Witness knew that the coat was a sack coat, but could not remember the size, nor whether it had round or square corners, nor whether it had a seam down the back, nor the length of the arms. The coat now exhibited to the witness was the identical coat the witness bought from Koppe for the deceased, and the one deceased was wearing when he left witness's house on June 13, 1887, to go to Rockdale. When he left witness's house the deceased was barefooted, having on neither shoes nor socks. The witness recovered the gun taken off by deceased from Mr. Riley of Hearne, by repaying him four dollars and a half—the amount he claimed to have paid the deceased for the gun.

Re-examined, the witness said that the deceased wore off two shirts, the inside one being a small checked shirt and the outside a blue cotton shirt. They were nearly new shirts, and, accord-

ing to the recollection of witness, had white buttons on them, opened in the back and were collarless. Witness did not know that deceased had or did not have shirt collars with him. He wore no suspenders.

William Riley testified, for the State, that he saw Willie Leonard in Hearne on the fifteenth day of June, 1887. On that day witness bought a muzzle loading double barreled shot gun from the said Willie Leonard, paying him therefor the sum of four dollars and a half, which, he said, was a larger amount than anybody else had offered him. The deceased was then wearing a gray black suit of clothes and was barefooted and bareheaded, having lost his hat, he said, since he left Bryan. After witness paid him the four dollars and a half, the deceased went down the street and bought a white and black straw hat, which, he said, was somewhat like the hat he had lost; and also bought a pair of low quartered lady's shoes. The said shoes had rubber and three or four buttons on the sides. When witness last saw him, he had the shoes over a pair of white and red striped socks, which he bought with the shoes. He then left, saying that he was going on foot ("walk the railroad") to the house of his uncle at Rockdale. He told the witness that he was going in company with a negro man, and, as he left the witness, the witness observed the defendant standing on the railroad platform about thirty feet distant. Witness never afterwards saw the defendant in Hearne, but saw him there three or four weeks before the said June 15, 1887.

On cross examination, this witness stated that his business was to attend the gate at the crossing of the railroads in Hearne, and that his duties required his presence at the junction to attend to the opening and closing of the gate. The witness first saw the boy on the evening of June 14, 1887, and bought the gun from him on the fifteenth. He took the boy to be about thirteen years old. He had seen the defendant in Hearne off and on during the three or four weeks next before June 15, 1887. Defendant's busi'iess during the time the witness saw him at Hearne was drumming for a hotel. The shoes bought by the boy in Hearne were number five. Witness did not observe any peculiarity of the boy's teeth, nor that his form was in any way disfigured. He appeared to be a little lame, and said that his feet were sore from walking. The deceased got off train number seven on the evening of June 14, and told witness that he had come from Bryan, and was going forward on foot to Rockdale. He left

Hearne on the evening of June 15. On the morning of June 16, witness inquired at the lunch stand for the boy, and was told that he left Hearne on the previous evening.

. Andrew Roper testified, for the State, that he thought, and was satisfied in his own mind that the defendant was the negro whom he saw with a white boy, on June 16, 1887, near the culvert. on the railroad between Hearne and Gause, and about three and a half miles from Gause, and a mile from the Brazos bridge. The boy would weigh about eighty or ninety pounds. The negro man who was with the boy asked witness how far it was to Gause, and witness told him it was about three and a half miles. The boy then asked witness if the trains stopped at Gause. The man and boy then started on towards Gause, and witness heard the boy say something to the man about what he was going to do when he got to Rockdale. On the next day the witness heard of the finding of the dead body of a boy on the railroad right of way, and on the following day he saw the defendant in Gause, and told several parties that he thought the defendant was the man he saw with the boy on the railroad track two days before.

Cross examined, the witness said that the point on the railroad where he saw the man and boy on June 16, was about one and a half miles beyond the Brazos river bridge from Hearne, and that the bridge was five miles from Hearne, making the distance from Hearne to the point where he saw them six and a half miles. Witness observed the boy more closely than he did the man, and did not speak more than a word or two to either. The witness could not absolutely swear that the defendant was the man he saw with the boy on the railroad, but could say that if he was mistaken in believing him to be, as he conscientiously did, the mistake could be accounted for by the fact that he never, in his life, saw two men so strikingly alike as the defendant on trial and the man he met with the boy. Witness had seen blacker negroes, but the defendant was quite black, as was the man he saw with the boy. The man and the boy were traveling from the direction of Hearne towards Gause and Rockdale when witness saw them on the sixteenth, and if either had a valise or anything in their hands, witness did not observe it.

The diagram used on the trial to illustrate the testimony of the witnesses appears in the record as a part of the statement of facts, but, as it is not deemed essential, it is omitted in this report.

A. W. McWilliams testified, for the State, that he first saw the defendant, to identify him, in Gause on Saturday, the day after the body of the boy was found on the right of way, which Saturday was either the seventeenth or eighteenth day of June, 1887. At about noon on Thursday, the day before the discovery of the body on the right of way, the witness saw a negro man and a white boy on the railroad track, about three miles from and going in the direction of Gause. Witness was in his wagon driving rapidly toward Gause with some beef which he had for sale. Just before he saw the said parties the witness met Andrew Roper traveling from the direction of Gause. When the witness first saw the parties he took them to be two men, but as he approached them nearer, he saw that one was a negro man and the other a white boy. It occurred to him that perhaps the negro man was one who had previously spoken to him about buying some meat, and witness accordingly increased the speed of his horse to overtake them. When witness first saw the parties they were opposite the Faubion tank, five or six hundred yards distant from witness. The witness was traveling from east to west over the dirt road. At a point a short distance west of the Faubion tank, the said dirt road left the railroad to pass around some brush, and came back to the railroad at the corner of the Sam Faubion field, five hundred yards distant from where it left the railroad. The witness saw the parties walking along the railroad track toward Gause when he reached the point where his road left the railroad, and he was then within two hundred and fifty yards of them. When he got back to the railroad at the corner of the Sam Faubion field, he stopped his wagon and looked up and down the railroad track, but could see nobody. He could not see the railroad track from the time that he left it at the point where the dirt road diverged until he got back to it at the corner of Sam Faubion's field. From the point last mentioned the railroad track was straight, and witness could see up and down it for a mile or more. The witness expected, by the rate of speed he drove, to intercept the parties on the track where the dirt road rejoined the track. The body of the boy was afterward found at a point immediately across the railroad track, and opposite the point where witness got back to the railroad. Besides the railroad track embankment at that place (the point opposite the dirt road and across the track) there was a very deep (seven feet, at least) wash or gully. No person or persons in that wash or gully

could be seen by a person from the dirt road across the track, and it was in that wash or gully that the body of the boy was found. The dirt road was about twenty feet north of the railroad bed. Witness stood up in his wagon to look up and down the track for the man and boy. Witness then went on to Gause, stopping at Robinson's house, two hundred yards from the east corner of Sam Faubion's field, where he tried to sell some beef. Witness at no time, while in sight of the parties, got nearer them than two hundred and fifty yards. He thought the boy was about five feet high.

Mrs. Quines testified, for the State, that, crossing the railroad track between noon and one o'clock on June 16, 1887, at a point about a half mile west of the Brazos bridge, she met a negro man and a white boy, traveling on foot towards Gause. The boy, to whom witness spoke, had on dark clothes and a perfectly white straw hat that had a black band around it. He wore a pair of new shoes, and had a paper protruding from one of his pockets. He appeared to be fourteen or fifteen years old, and about four feet high. Witness did not observe the negro man closely, but thought he wore dark clothes and a white hat. The defendant was the man the witness saw with the boy on the railroad track as stated. He then had no valise nor satchel, that the witness saw. About three o'clock in the evening the defendant, carrying a black satchel, came to the witness's house, which was situated near the point on the railroad where the witness met him and the boy in the morning, and asked for a drink of water. He came to the house from the direction of Gause, and witness recognized him at once as the man she saw with the boy in the morning. He then had on a blue shirt. He left the house a little after three o'clock, just as a freight train passed towards Gause, and he went back towards Gause.

Mrs. Amanda Padget testified that she lived in a house about three hundred yards distant from Mrs. Quines's house. Defendant was the same negro man who came to witness's house about three o'clock on the evening of Thursday, June 16, 1887. He brought a black valise or satchel with him, which he opened while at the house to get some tobacco. He worked at witness's house all day Friday, and on Saturday until noon. Something was said on Saturday about the discovery of the body of the boy on Friday, and the defendant remarked that he would "bet it was the same boy he was with on the railroad." The news of the discovery of the boy's body reached witness's house

between ten and eleven o'clock on Saturday morning. Defendant left the house after dinner on that day. He was then wearing dark trousers, blue shirt and a white straw hat.

Cross examined, the witness said that, when the conversation about the dead boy occurred, in which defendant said that he would bet the body was that of the boy he was with on the railroad, Mr. Frazier and his son and the witness's brother-in-law, Mr. Sprotts, were present. Witness observed no agitation about the defendant when he remarked that he would bet it was the boy he was with on the railroad. None of the parties present suspected the defendant at that time. Defendant finished all the work witness had for him before he left on Saturday evening. The boy had not been described when defendant said that he would bet he was the boy he traveled the railroad track with.

R. Robertson testified, for the State, that his house was situated on the south side of the railroad, and fronted north. Witness was eating his dinner under a shade in his back yard on Thursday, June 16, when Mr. McWilliams came to his house en route to Gause. The place where, on the next day (Friday), the body of the boy was found, was on the south side of the railroad track, opposite the east corner of the Sam Faubion field. It was about eight hundred yards distant from where the witness worked. Witness lay down on the floor of his house after dinner to await the arrival of Mr. Stevens on the down passenger train, to inspect some wood witness was getting out for him. Stevens sometimes got off at the Burkett and Murphy camp, near the bridge, and walked to witness's house. Expecting Mr. Stevens, the witness watched the road in front of his house closely, and knew that nobody passed the house on that evening after Mr. McWilliams did. Witness had never heard that he was suspected of murdering the boy.

Frank Roper testified, for the State, that he saw the defendant at the Sing Beaver crossing of the railroad track between Gause and the Brazos bridge on Thursday, June 16, 1887. Defendant was then about twenty-five steps from the railroad track. Defendant then asked witness the way to Cunningham's house, and said that he had been hired by Cunningham's brother-in-law to chop cotton. Cunningham's brother-in-law was then driving a bunch of yearlings, about three hundred yards ahead of witness and defendant. It was then about sun set. Defendant had a black valise or satchel with him.

James Taylor testified, for the State, that the defendant came to Cunningham's house on the evening of Thursday, June 16, 1887, hunting work. He told Mr. Cunningham that his, Cunningham's brother-in-law, sent him to the house. Mr. Cunningham did not need or want defendant, but sent him to Padget's. Defendant, when he came to Cunningham's house, had a black valise or satchel. Early on the next morning witness saw the defendant on Padget's gallery, looking through his valise. Cunningham's house was about three quarters of a mile from Sing Beavers's crossing. Padget's house was about a mile from that crossing.

W. A. Frazier testified, for the State, that he saw the defendant at Cunningham's house on the evening of Thursday, June 16, 1887, and afterwards, on the next day, at Padget's house. Witness had a conversation with defendant on Saturday at Padget's. He told witness on that occasion that he came from Murphreesboro, Tennessee, and, that he left Tennessee nine days before. At that time, about ten o'clock a. m., on Saturday, witness and defendant were at work in Padget's field. While conversing, the sound of the blowing of horns and the baying of hounds reached them, and defendant asked what it meant. Witness replied that he presumed some of the neighbors were out hunting. Defendant then asked witness if Mr. Lewis's blood hounds ever caught any fugitives from justice, and witness told him that Lewis's hounds were trained animals. Witness saw the defendant in Gause on the same evening, and asked him where he met the boy he traveled with on the railway track. He replied that he met him at the Brazos bridge. Witness then asked him where he left the boy, and he replied that he left him at the corner of the field below the wood yard. The field he referred to was Sam Faubion's field. He then told the witness that the boy he was with had on a pair of black jeans trousers, such as he wore himself, a pair of rough brogan shoes, with a patch on the side of one of them, and a black hat like his. Defendant then had on a pair of brogan shoes.

Cross examined the witness said that the conversation with the defendant in Gause was held on the gallery of the drug store. Constable W. E. Peel and three or four other white persons were present. Witness was in Gause to report to the constable what he had heard the defendant say in Padget's field, and to cause his arrest. There was no excitement among the people of Gause at the time of the conversation between witness and de-

fendant on the drug store gallery, but the excitement ran high after the arrest of defendant. Witness told Peel of his conversation with the defendant in the Padget field, before he talked with defendant on the gallery. Witness thought then that defendant ought to be arrested, but did not so advise Peel. Peel called witness into the store and told witness that he wanted him, witness, to ask defendant some questions before he, Peel, should make the arrest. Witness asked defendant the first question: "Where did you meet the boy?" He replied: "At the Brazos bridge." The next question was asked either by witness or Peel, and about that time the defendant walked off, and when witness next saw him, a short time later, he was under arrest. The defendant appeared to be somewhat frightened when questioned, but answered the questions readily. He walked the floor and looked restless and uneasy. Excited people flocked into the drug store after the arrest of defendant, and the officers then conveyed him to Cameron for safe keeping.

John Pate was the next witness for the State, and his is the testimony involved in the ruling announced in the second head-note of this report. He testified that he heard of the discovery of the body of the boy on Saturday evening, and saw the defendant in Gause a few minutes later. This was about thirty minutes before the arrest of defendant, and witness and several parties were eating a watermelon. The parties, except witness and defendant, separated after the melon was eaten, when defendant, having purchased a cigar in the store, and obtained a match from witness, remarked to witness that he thought the "crowd was d—d inquisitive about the boy." Speaking then of a boy with whom he had traveled on the railroad track a day or two before, he said that that boy had on a pair of shoes, one of which was patched on the side like his. He then showed his shoes, one of which was patched on the side. The patch was roughly sewn on from the outside. On the morning of the next day Will Lovelace went with the witness and showed him the place where the dead body of the boy was said to have been found. The water in the ditch was then bloody. At that point in the ditch or gully where the body was said to have been found the witness saw the imprint of a run down shoe that had a patch on the side. That track was made with just such a shoe as the defendant had on and showed witness on the day before.

Cross examined, the witness said that the ditch, at the point

where he saw the track described, was six or eight feet deep. Witness did not go down into the ditch, and could not tell whether tracks would appear different to a man looking down on them from an elevation than they would to a man standing by them. From the point on the bank where witness stood, the track appeared to be about a number eight in size, but may have been larger.

P. Birdsong testified, for the State, that about mid afternoon on Friday, June 17, 1887, he and others found the dead body of a white boy, fourteen or fifteen years old, on the railroad right of way. The head and neck lay in a puddle of water. Ten or twelve feet below the body the parties found the boy's coat and hat. The head was crushed in at the left temple, a heavy instrument of some kind evidently having been used. There were other wounds about the head. The body had on two shirts, the outer shirt being of a blue cotton fabric, and the under one being a checked shirt. The vest and trousers were of the same material as the coat which was found, doubled up, in a small pool of water, ten or twelve feet below the body. A piece of iron with a little blood on it was also found in that pool of water. The coat and piece of iron now exhibited, the witness identified as the articles found in the said pool of water. The boy's head was sunk in the water to his shoulders, his mouth being out. The hole contained six or eight gallons of water. Witness saw the distinct track of a lady's shoe at the water hole near the body. The plain track of a run down shoe was also visible. Witness was in the town of Gause two or three hours after the arrest of the defendant, and saw a small sized white handkerchief taken from the defendant. The handkerchief was stained with blood, and a small piece of the skin of a white person was clinging to it. The piece of skin was between a fourth and a half inch in length, and about the sixteenth of an inch wide. The defendant's valise was then examined, and was found to contain two blue overshirts, two shirts and two undershirts, all very small, and of a size to fit a boy of from twelve to fifteen years old, and also two pair of drawers and several pairs of socks.

Cross examined, the witness said that he reached the scene of the tragedy within two hours after the discovery of the body, and made a careful examination of the ground. The soil immediately at the ditch was hard and grassy, and the whole of the large track impressions could not be seen, but enough was visible

to show that the shoe that made it was run down.  **The** imprint of the lady's shoe was perfect.  The same tracks were found on "top of the ditch (on the banks) and at another place in the ditch."  The hat found near the body was a perfectly white straw hat with a black band.  The socks on the boy's feet were purple and white striped, and were perfectly clean.  He had no collar on.  Mr. Lovelace took charge of the piece of skin found on the defendant's handkerchief.  The run down track was traced from the boy's body to the point where the boy's coat and the piece of iron—a broken railroad "fish bar"—were found.  When arrested, the defendant had on a pair of run down shoes, the tracks of which corresponded exactly with the run down tracks found at the body of the boy.

Will Lovelace testified, for the State, that he was the fourth or fifth man to reach the body of the boy after its discovery. The boy's head was lying in a hole of bloody water.  It had been crushed in at the left temple, and was broken at two other places.  The boy had on a pair of "reddish blue" striped socks. His outside shirt was of blue linen or cotton, and his inside shirt was of checked cotton.  The trousers, vest and coat were alike. The coat, which witness identified as the coat in evidence, was found crowded into a water hole ten or twelve steps below the body.  The piece of iron fish bar in evidence was found in the water hole with the coat.  A little blood and a few hairs were adhering to the fish bar when found.  Witness saw the imprint of the boy's feet where he sprang from the bank to get down to the water.  That track was made with a small dress shoe, but could not be traced from the body.  The other two tracks, made by the run down shoe, indicated that the party who made them straddled the boy.  Those two tracks—of the run down shoes— straddling the boy were very plain and distinct.  Witness saw tracks made by defendant after his arrest, and they were exact reproductions of the run down tracks found at the boy's body. Witness saw the handkerchief taken from the defendant after his arrest.  The handkerchief was blood stained and showed the imprint of fingers.  The handkerchief seemed to have been used to dry bloody hands that had recently been imperfectly washed. A fragment of white human skin was adhering to the handkerchief.

Cross examined, the witness said that he had seen other tracks of run down shoes that resembled the tracks found at the place of the murder.  Witness did not apply the shoes of the defend-

ant to the run down tracks found near the body. The witness put the fragment of skin in a paper and left it in Moore & Faubion's store in Gause, and forgot to bring it to court. The track of the run down shoe was traced from the body of the boy to the water hole in which the coat and broken fish bar were found; thence it was traced south across the "right of way" forty or fifty feet, to thick brush and timber, to a point where blood was found on some leaves, which appeared to have been left there by the wiping of bloody hands. The track was then trailed east to the Jo. Taylor branch, where it entered the branch and followed it down to a point below the Sing Beaver field, where the party got down on his hands and knees and drank from a puddle of water. Thence the track was trailed back to the railroad near the Sing Beaver crossing, where the track, going towards the Burkett & Murphy wood camp, was lost. That camp was a short distance south of the bridge and west of the railroad track. The tracks were such as the shoes of the defendant would make. John Pate and others trailed the track with the witness.

Mr. Frazier, recalled by the State, said that defendant, in the conversation with him, told him that when he left the boy at the corner of Sam Faubion's field, it was to go to Burkett & Murphy's wood camp to intercept and board a freight train which he heard signaling at that camp.

The State closed.

John Thompson, the first witness for the defense, testified that he saw the defendant on the day of his arrest, and paid him a dollar and ten cents for chopping cotton for Padget.

Constable Peel testified, for the defense, that when arrested the defendant had a dollar and some cents on his person. Witness took the handkerchief found on defendant's person to his home and hung it up over the door. He afterwards moved from that house, forgot the handkerchief and left it where he hung it. The handkerchief was never microscopically examined, but from its condition and appearance witness thought it had been used to wipe bloody hands that had recently been imperfectly washed.

Mr. Cunningham testified, for the defense, that the defendant wore a black hat to his house on Thursday, June 16, 1887. He sold a white straw hat to Thompson, for which witness, on Saturday before the arrest, paid him fifty cents.

Lee Quinn testified, for the defense, that he lived in Montgomery county, Texas. Witness first saw defendant about the mid-

dle of March, 1887, at Baker's commissary, in Montgomery county, Texas, when he worked on the tram way railroad until about the middle of June, 1887. He quit work about June 10, 1887.

Mr. Mayer testified, for the defense, that he lived in Montgomery county, Texas, at Baker's commissary, of which establishment witness was clerk. Defendant began work at witness's place of business on the nineteenth day of March, 1887, and worked there continuously until June 11, 1887. Witness paid defendant no money when he quit work. About ten dollars was d re him, which he took up in dry goods, shirts, socks, etc. The shirts and socks found in defendant's valise were identified by the witness as some of the articles sold by him to defendant. Hearne was seventy or seventy-five miles, by railroad, from Baker's commissary, in Montgomery county, where witness last saw defendant, on June 11, 1887.

No brief for the appellant has reached the Reporters.

*W. L. Davidson,* Assistant Attorney General, and *P. S. Ford,* for the State.

Willson, Judge. 1. No error was committed with reference to the defendant's challenge of the proposed juror Alsup. It appears from the bill of exception that said Alsup was competent to serve as a juror in said cause, and furthermore the defendant did not exhaust his peremptory challenges in the organization of the jury, and said Alsup did not serve upon said jury, but was challenged by the defendant, and the challenge was not counted against him, the court, in effect, allowing said challenge as one for cause.

2. There was no error in admitting the testimony of John Pate, nor in refusing to exclude it from the jury. It was proof of circumstances relevant to the issue, and, however remote it may be, was not for that reason inadmissible.

3. With regard to the bills of exception to the remarks of counsel for the prosecution in their arguments to the jury, we are of the opinion that no reversible error is shown. It may be conceded that the remarks objected to were not strictly proper and legitimate. They were, however, promptly condemned by the court, in the hearing of the jury, and, under the circum-

stances, could not have prejudiced the defendant or in any manner have affected his rights injuriously.

4. There is no doubt in our minds as to the sufficiency of the evidence to warrant and sustain the conviction. While the evidence is circumstantial, it is of that cogent and conclusive character which produces moral certainty and excludes every hypothesis except that of the defendant's guilt. The deceased was clearly identified by age, size, clothing and other circumstances. The defendant was identified by both positive and circumstantial evidence as the person who was last seen in company with the deceased, in the immediate vicinity of where the dead body of deceased was discovered, and the dead body furnished indubitable evidence that death had resulted from the violent act of another.

There is but one particular in which the evidence falls short of that certainty demanded by the law, and that is as to the venue of the offense. There is no direct testimony that the murder was committed in Milam county, or that the place where the dead body was found was in Milam county. It is not required, however, that venue should be established by direct testimony, nor that it should be proved beyond a reasonable doubt. It may be proved by circumstantial evidence, as any other fact, and if the evidence be reasonably sufficient to satisfy the jury that the offense was commited in the county of prosecution, this court will not disturb the conviction. (Nance v. The State, 17 Texas Ct. App., 385; Hoffman v. The State, 14 Texas Ct. App., 406; Achterberg v. The State, 8 Texas Ct. App., 463; Diggs v. The State, 7 Texas Ct. App., 359.)

In this case the evidence shows that the defendant and the deceased were traveling together, walking from Hearne, in Robertson county, towards Gause and Rockdale, in Milam county. They were walking on a railroad track. They had crossed the Brazos river on the railroad bridge and were seen together near where the dead body of the deceased was found, at a point on the railroad right of way at least a mile and a half west of the Brazos river. These facts alone would certainly not establish the venue of the offense to be in Milam county. But the courts take judicial notice of the boundaries and limits of counties, and their relation or contiguity to each other. (The State v. Jordan, 12 Texas, 205; 1 Greenl. Ev., sec. 6, p. 22.) This judicial notice establishes that Robertson and Milam counties adjoin each other, the Brazos river being the common boundary line between

them; Robertson county being located east and Milam west of said river. It follows, therefore, that a point on a line extending from Hearne, in Robertson county, westward one mile and a half west of the Brazos river, would be in Milam county, said line, as shown by a plat of the locality in evidence, being a straight one from Hearne to the point where the murder was committed. Considering together the facts proved and the facts which are matters of judicial knowledge, there is no room for doubting that the murder was committed in Milam county. The *locus in quo* could not possibly be in any other than Milam county.

We find no error in the conviction, and the judgment is affirmed.

*Affirmed.*